Roger L. Falk, Ks.Sp.Ct. #09972, of the
LAW OFFICE OF ROGER L. FALK, P.A.
301 West Central Avenue
Wichita, Kansas 67202-1077
Telephone: (316) 265-5115
Fax: (316) 265-5183
E-mail: roger_falk@sbcglobal.net

**UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Criminal Case No. 13-CR-10057-MLB |
| | ) | |
| MANJUR U. ALAM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

# SENTENCING MEMORANDUM

**COMES NOW** the Defendant, Manjur U. Alam, by and through his attorneys of record, Roger L. Falk, of the Law Office of Roger L. Falk, P.A., and James T. McIntyre, of the Law Office of James T. McIntyre, and respectfully submit the following Sentencing Memorandum for the Court's Consideration at the time of sentencing.

## I.
## ISSUE BEFORE THE COURT

A. What is the appropriate sentence to be imposed in this case, taking into consideration the advisory sentencing guidelines and 18 USC § 3553?

1. Since the amount of the "actual loss" or "intended loss" is the most influental factor in determining the advisory guideline range, what is the:

a. "Actual Loss" in this case, and how do you determine that dollar figure?

b. "Intended Loss" in this case and how do you arrive at that figure?

2. Are there alternative methods for determining the loss, and which one if any is better to use in this case?

a. The method used by the government and PSI Report;

b. The method suggested in the Defendant's Objections to the PSI Report;

c. Some other method?

3. Are there any aggravating circumstances present which the Court should consider in imposing a sentence in this case?

4. Are there any mitigating circumstances present which the Court should consider at the time of sentencing?

## II.
## FACTS OF THE CASE WHICH ARE RELEVANT TO THE ISSUES RAISED ABOVE

### A.
### FACTS SURROUNDING THE VARIOUS SALES OF PROPERTY

Before discussing the instant case, it is necessary to acknowledge a fact that does not bode well for the defense. At the time of the financing many of the properties which are the subject of this litigation, the Defendant was on probation to Judge J. Thomas Marten, in Criminal Case No. 05-10254-002-JTM. A copy of the Judgment entered in that case is attached to this Sentencing Memorandum as Defendant's Exhibit "A." (See Dkt. #133 in 05-10254-002-JTM) According to this document, the Defendant Manjur Alam was sentenced to a term of probation for one year.

During the time period between 2006 and 2008, the Defendant was involved in the acquisition of distressed housing at foreclosure sales, tax sales and the like. When the Defendant found an appropriate property, the property would be purchased and title would be transferred to his investor's name. Each of the various investors put up the 20% down payment required by the lender financing the same. This is the ordinary course of business where a person acquires housing which is either going to be: (1) rehabilitated and flipped; or (2) rehabilitated and held by the investor as a rental property. This differs from the subsequent sales, which were the subject of the fraud in this case. For the sake of clarity, these will be referred to as "original acquisition(s)" of the properties in question, with the later sales being designated as the "fraudulent transaction(s)."

In original acquisitions the investor would provide the 20% down payment, in exchange for which he was to receive his 20% down payment back when the property was sold, along with 50% of the net revenue generated from the fraudulent transactions or subsequent sales. In arriving at the net revenue, the following formula was used in each case:

| | |
|---|---|
| Subsequent Sale or Fraudulent Transaction Price | $100,000.00 |
| minus the investor's 20% down | - 10,000.00 |
| minus any repair costs | – 20,000.00 |
| minus balance of mortgage payable to first bank | - 40,000.00 |
| Net proceeds from the fraudulent transaction | + 30,000.00 |
| Divided in half | $ 15,000.00 |

This equation, for illustration purposes only, assumes that the subsequent sale's gross amount was $100,000.00, and that the original acquisition price was $50,000.00. This would require the

investor to pay $10,000.00 at the time of closing or 20% of the purchase price, with the remaining $40,000.00 financed with a lending institution. Assuming repair costs were paid by the Defendant, he would walk away from the closing on the fraudulent transaction with a check for $35,000.00[1], and his investor would walk away with a check for $25,000.00.[2]

In order to obtain financing for the subsequent buyers (the Co-Defendants) the Defendant and Co-Defendants made representations to the lending institutions which were false, fraudulent or misleading. The one common false statement contained in all of the financial loan applications was a statement that the subsequent purchaser (Co-Defendant) intended to live in the property as his primary residence, when Manjur Alam and the Co-Defendant knew that the property was being acquired as an investment, to be held by the subsequent purchaser (Co-Defendant) as a rental unit. This was done in order to take advantage of the fact that if it had been disclosed that these properties were bing purchased as an "investment" to generate income, most lending institutions require a 20% down payment. However, if the subsequent purchaser claimed on his loan application that he was going to reside in the house as his primary residence, then the lending institution would allow them to make only a 3% down payment. Owner occupied financing also included a requirement that mortgage insurance be obtained from either HUD, FHA or FNME. This was an extra cost at closing, but was far less than the 17% saved by making the fraudulent representations.

In the cases where a subsequent purchaser (Co-Defendant) acquired more than one house (example: Bruce Dykes acquired 4 houses), it would necessary to submit the loan applications almost

---

[1]This is one half of the net profit, plus the costs of repairs.

[2]This is one half of the net profit, plus the 20% down payment of $10,000.00/

simultaneously, and to conduct the closings within 30 to 60 days of each other. This was necessary so that a credit check on the subsequent purchaser (Co-Defendant) did not reveal that the existence of the other mortgages.

On all of the houses which are the subject of this litigation, the required loan payments were defaulted upon, and the properties ended up in foreclosure proceedings, in the District Court for Sedgwick County, Kansas. On each of these properties the Court determined the amount of money due and owing to the lending institutions and ordered these properties to be sold, with the proceeds of said sale going first to the payment of the Sheriff's fees and the Court costs, with the balance divided among the lending institutions and other creditors of the subsequent buyers (Co-Defendants). All of the properties were then sold, pursuant to the Court's order, at a public auction, held on the Courthouse steps, after notice of the same was published as required by law.

At each of the foreclosure sales, conducted by the Sheriff of Sedgwick County, Kansas, the properties sold for the full amount of the loan against the properties, plus accrued interest and the costs of the action. There were no deficiency judgments taken or entered when the results of the Sheriff's auctions were reported to the District Court. Therefore, the debtors were dissolved of any liability to the respective lending institutions, because they were made whole by the proceeds from the auction sales.

It was only after the Sheriff's auctions of these properties that the lending institutions acquired title to the same, by being the successful bidder at the Sheriff's auction. Prior to that they were just a lien holder. However, the lending institution would be required to afford the judgment

debtor (Co-Defendants) a 90 day right of redemption. Therefore, the lending institutions could not provide clear title to the properties until 90 days after the Sheriff's auction.

On many of the subject properties, the lending institutions continued to carry them on their books for as long as two years before even listing the same for sale. During the interim, the properties were the subject of vandalism and theft. As an example only, 1510 North Market had substantial repairs made to it prior to the sale to the subsequent buyer (Co-Defendant). However, by the time it was listed, following the Sheriff's Auction by the lending institution, the stair case, central air conditioner, the plumbing fixtures, and all the copper tubing in the house had been removed, with extensive damage done to the interior of the home.

However, once the properties were listed for sale, many of them sold within days of being listed on the Multi-List service, and at least one, within minutes of being listed. However, it should be noted that the listing broker, the broker doing the BOP (broker opinion price - which then determines the listing price) and the selling broker were all the same person. This is indicative of having investors already lined up to purchase these properties before they even go onto the Multi-List service. All of the properties sold for well below their appraised value, with some even being advertized for as much as $47,000.00 below the appraised value of the homes.

Finally, at Defendant's request, James Hudson, of Hudson Consulting Services, has prepared a detailed report of the properties involved in this case, and set forth therein his estimate of the Fair Market Value of each of the properties in question, at the time that they were acquired by the lending institutions.

**B.**
**FACTS RELEVANT TO THE INDIVIDUAL CHARACTERISTICS OF THE DEFENDANT**

Here the Defendant Manjur Alam has only one prior conviction. However, that conviction is for doing exactly the same thing, with other investors. In that case, because he had no prior criminal history, the Court (Judge Marten) sentenced the Defendant to probation for a term of one year. See Exhibit "A" attached hereto.

As a result of that conviction, the Defendant is a criminal history category of II, one point scored for the above conviction, with two points added because he was on probation for that offense at the time of the commission of the instant offenses. As a result, his sentence is enhanced by virtue of this prior and being on probation for the same.

However, to just look at this forms an incomplete picture of Manjur Alam. He and his wife, Ruksana, own a hotel and grocery store in Wichita, Kansas. In this regard please see the list of assets and liabilities previously provided to the U.S. Probation Office. The Defendant was also involved with a number of individuals in the purchase of and flipping of houses. The Defendant is a hard working individual. He came to this country from Bangladesh with little or no assets, he worked hard and became a U.S. Citizen. He owned and operated three businesses, often times working 14 to 16 hour days, 7 days a week in an effort to keep all three business running profitably.

The Defendant has also completed a bachelors degree from Wichita State University. He is also a regular contributor to a number of charities, as is evinced by the various certificates which are atttached hereto as Defendant's Exhibit "C". He is also an essentially good person, as is evinced by

the 48 letters attached to this Sentencing Memorandum. All of these various facts will be discussed in greater detail as they are relevant to the arguments and authorities listed below.

## III.
## ARGUMENTS AND AUTHORITIES

The first area of concern in most sentencing cases is what do the advisory guidelines say should be done in this case. In this regard, U.S.S.G. § 2B1.1 applies in cases involving fraudulent transactions such as the instant case. That advisory guideline reads as follows:

> § 2B1.1. Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States [Caution: See prospective amendment note below.]
>
> (a) Base Offense Level:
>
> (1) 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or
>
> (2) 6, otherwise.
>
> (b) Specific Offense Characteristics
> (1) If the loss exceeded $ 5,000, increase the offense level as follows:

| Loss (Apply the Greatest) | Increase in Level |
|---|---|
| (A) $ 5,000 or less | No increase |
| (B) More than $ 5,000 | add 2 |
| (C) More than $ 10,000 | add 4 |
| (D) More than $ 30,000 | add 6 |
| (E) More than $ 70,000 | add 8 |
| (F) More than $ 120,000 | add 10 |
| (G) More than $ 200,000 | add 12 |
| (H) More than $ 400,000 | add 14 |

(I) More than $ 1,000,000 ....................... add 16
(J) More than $ 2,500,000 ...................... add 18
(K) More than $ 7,000,000 .................... add 20
(L) More than $ 20,000,000 .................... add 22
(M) More than $ 50,000,000 ................... add 24
(N) More than $ 100,000,000 ................. add 26
(O) More than $ 200,000,000 ................. add 28
(P) More than $ 400,000,000 ................. add 30.

(2) (Apply the greatest) If the offense--

(A) (i) involved 10 or more victims; or (ii) was committed through mass-marketing, increase by 2 levels;

(B) involved 50 or more victims, increase by 4 levels; or

(C) involved 250 or more victims, increase by 6 levels.

(3) If the offense involved a theft from the person of another, increase by 2 levels.

(4) If the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property, increase by 2 levels.

(5) If the offense involved misappropriation of a trade secret and the defendant knew or intended that the offense would benefit a foreign government, foreign instrumentality, or foreign agent, increase by 2 levels.

(6) If the offense involved theft of, damage to, destruction of, or trafficking in, property from a national cemetery or veterans' memorial, increase by 2 levels.

(7) If (A) the defendant was convicted of an offense under *18 U.S.C. § 1037*; and (B) the offense involved obtaining electronic mail addresses through improper means, increase by 2 levels.

(8) If (A) the defendant was convicted of a Federal health care offense involving a Government health care program; and (B) the loss under subsection (b)(1) to the Government health care program was (i) more than $ 1,000,000, increase by 2 levels; (ii) more than $ 7,000,000, increase by 3 levels; or (iii) more than $ 20,000,000, increase by 4 levels.

(9) If the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization, or a government agency; (B) a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding; (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines; or (D) a misrepresentation to a consumer in connection with obtaining, providing, or furnishing financial assistance for an institution of higher education, increase by 2 levels. If the resulting offense level is less than level 10, increase to level 10.

(10) If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(11) If the offense involved (A) the possession or use of any (i) device-making equipment, or (ii) authentication feature; (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device, or (ii) authentication feature; or (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification, or (ii) the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification, increase by 2 levels. If the resulting offense level is less than level 12, increase to level 12.

(12) If the offense involved (i) substantially more than two threatening communications to the same victim, (ii) a prolonged period of making harassing communications to the same victim, (iii) substantially more than two false liens or encumbrances against the real or personal property of the same victim, (iv) multiple victims, or (v) substantial pecuniary harm to a victim, an upward departure may be warranted.

(13) If the offense involved an organized scheme to steal or to receive stolen (A) vehicles or vehicle parts; or (B) goods or chattels that are part of a cargo shipment, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

(14) If the offense involved (A) the conscious or reckless risk of death or serious bodily injury; or (B) possession of a dangerous weapon (including a firearm) in connection with the offense, increase by 2 levels. If the resulting offense level is less than level 14, increase to level 14.

(15) (Apply the greater) If–

(A) the defendant derived more than $ 1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels; or

(B) the offense (i) substantially jeopardized the safety and soundness of a financial institution; (ii) substantially endangered the solvency or financial security of an organization that, at any time during the offense, (I) was a publicly traded company; or (II) had 1,000 or more employees; or (iii) substantially endangered the solvency or financial security of 100 or more victims, increase by 4 levels.

(C) The cumulative adjustments from application of both subsections (b)(2) and (b)(15)(B) shall not exceed 8 levels, except as provided in subdivision (D).

(D) If the resulting offense level determined under subdivision (A) or (B) is less than level 24, increase to level 24.

(16) If (A) the defendant was convicted of an offense under *18 U.S.C. § 1030*, and the offense involved an intent to obtain personal information, or (B) the offense involved the unauthorized public dissemination of personal information, increase by 2 levels.

(17) (A) (Apply the greatest) If the defendant was convicted of an offense under:

(i) *18 U.S.C. § 1030*, and the offense involved a computer system used to maintain or operate a critical infrastructure, or used by or for a government entity in furtherance of the administration of justice, national defense, or national security, increase by 2 levels.

(ii) *18 U.S.C. § 1030(a)(5)(A)*, increase by 4 levels.

(iii) *18 U.S.C. § 1030*, and the offense caused a substantial disruption of a critical infrastructure, increase by 6 levels.

(B) If subdivision (A)(iii) applies, and the offense level is less than level 24, increase to level 24.

(18) If the offense involved--

(A) a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director of a publicly traded company; (ii) a registered broker or dealer,

or a person associated with a broker or dealer; or (iii) an investment adviser, or a person associated with an investment adviser; or

(B) a violation of commodities law and, at the time of the offense, the defendant was (i) an officer or a director of a futures commission merchant or an introducing broker; (ii) a commodities trading advisor; or (iii) a commodity pool operator,
increase by 4 levels.

(c) Cross References

(1) If (A) a firearm, destructive device, explosive material, or controlled substance was taken, or the taking of any such item was an object of the offense; or (B) the stolen property received, transported, transferred, transmitted, or possessed was a firearm, destructive device, explosive material, or controlled substance, apply § 2D1.1 (Unlawful Manufacturing, Importing, Exporting, or Trafficking (Including Possession with Intent to Commit These Offenses); Attempt or Conspiracy), § 2D2.1 (Unlawful Possession; Attempt or Conspiracy), § 2K1.3 (Unlawful Receipt, Possession, or Transportation of Explosive Materials; Prohibited Transactions Involving Explosive Materials), or § 2K2.1 (Unlawful Receipt, Possession, or Transportation of Firearms or Ammunition; Prohibited Transactions Involving Firearms or Ammunition), as appropriate.

(2) If the offense involved arson, or property damage by use of explosives, apply § 2K1.4 (Arson; Property Damage by Use of Explosives), if the resulting offense level is greater than that determined above.

(3) If (A) neither subdivision (1) nor (2) of this subsection applies; (B) the defendant was convicted under a statute proscribing false, fictitious, or fraudulent statements or representations generally (e.g., *18 U.S.C. § 1001*, *§ 1341*, *§ 1342*, or *§ 1343*); and (C) the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline in Chapter Two (Offense Conduct), apply that other guideline.

(4) If the offense involved a cultural heritage resource or a paleontological resource, apply § 2B1.5 (Theft of, Damage to, or Destruction of, Cultural Heritage Resources or Paleontological Resources; Unlawful Sale, Purchase, Exchange, Transportation, or Receipt of Cultural Heritage Resources or Paleontological Resources), if the resulting offense level is greater than that determined above. (Emphasis added.)

Here, as in most fraud cases, the offense level generated in a PSI report is often the product of the amount of the "actual loss" or "intended loss," whichever is greater. In the instant case the

Defendant has taken the position that the actual loss is zero, because at the Sheriff's auction the fulll amount of loan, plus costs and interest were bid and collected by the Sheriff. In support of that claim the Court's attention is drawn to United States v. Crowe, 735 F.3d 1229, (10th Cir., 2013). That case, like the present one, involved a real estate transaction, with fraudulently obtained loans and the application of USSG. § 2B1.1(b). In resolving this issue, the Tenth Circuit held that:

> *The district court's calculation of loss under U.S.S.G. § 2B1.1*
>
> Generally speaking, "sentences are reviewed under an abuse of discretion standard for procedural and substantive reasonableness." United States v. Gordon, 710 F.3d 1124, 1160 (10th Cir. 2013) (internal quotation marks and brackets omitted). "A sentence is procedurally unreasonable if," among other things, "the district court incorrectly calculates . . . the Guidelines sentence . . . [or] relies on clearly erroneous facts." Id. (internal quotation marks omitted).
>
> "When a defendant challenges the procedural reasonableness of his sentence by attacking the district court's loss calculation, our task is to determine whether the district court's factual finding of loss caused by the defendant's fraud is clearly erroneous." Id. at 1161 (internal quotation marks and brackets omitted). "In other words, we may disturb the district court's loss determination—and consequent Guidelines enhancement—only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." Id. (internal quotation marks omitted). "However, the district court's loss calculation methodology is reviewed de novo." Id.
>
> In this case, the district court imposed a base offense level pursuant to U.S.S.G. § 2B1.1(a) and then imposed an 18-level enhancement pursuant to U.S.S.G. § 2B1.1(b).
>
> > Section "2B1.1(b) increases a defendant's base offense level for fraud according to the amount of the loss." United States v. Washington, 634 F.3d 1180, 1184 (10th Cir. 2011). "The court is instructed to use the greater of actual or intended loss." Id. (citing U.S.S.G. § 2B1.1 cmt. n.3(A)). "If the loss is not reasonably determinable, then a court must use the gain that resulted from the fraud as an alternative measure." Id. (quoting U.S.S.G. § 2B1.1 cmt. n.3(B)). "The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual

or intended loss to the victims." Id. (internal quotation marks omitted).

*a) Reasonable foreseeability of the loss*

In challenging the district court's calculation of loss, Crowe argues, in part, that because she, "the mortgage broker Jackson, and the lending institutions all wanted and expected the mortgages [at issue] to work out during the mid-decade real-estate boom, no loss was 'reasonably foreseeable' within the meaning of Comment 3(A) to" § 2B1.1. Aplt. Br. at 6. "Indeed," Crowe argues, "it was only because everyone involved in the boom expected the mortgages to work out that [she] was able to get them." Id. For example, she asserts, "[l]enders, faced with a rising market, believed that the homes they were lending on were adequate security and consequently did not do even the minimal employment or income verification that would have disqualified [her]." Id. Crowe in turn asserts that "[i]f the lenders and the mortgage broker, professionals in the business, did not foresee the 2008 collapse in the real-estate market, then it is not reasonable to expect that Crowe would have foreseen that collapse in 2004, 2005, or 2006, when she committed the alleged fraud." Id. at 6-7.

Crowe also argues that the district court erred "in jumping from the conclusion that [she] should have known that the loan amount was the maximum potential loss to the quite different conclusion that the difference between the outstanding loan amount and the foreclosure proceeds was 'the foreseeable pecuniary harm to the lenders.'" Id. at 7-8 (quoting ROA, Vol. 3, at 2208). More specifically, Crowe argues that "[t]he district court was correct to conclude that [she] knew what the maximum potential loss was, but wrong to conclude that this means that the actual loss was reasonably foreseeable by [her] when she applied for the mortgages in 2004, 2005, and 2006." Id. at 8. And, Crowe argues, "[b]ecause the district court used the wrong legal standard — maximum potential loss instead of reasonably foreseeable loss — this Court should remand for resentencing and instruct the district court to make a finding about what loss, if any, [she] could reasonably have foreseen." Id.

We conclude, however, that Crowe's arguments are contrary to the clear language of U.S.S.G. § 2B1.1 and its accompanying commentary. Section 2B1.1(b)(1) states that a district court shall enhance a defendant's base offense level "[i]f the loss exceeded $5,000." Depending upon the specific amount of the loss, this enhancement can range from 2 to 30 levels. U.S.S.G. § 2B1.1(b)(1)(A)-(P). Application Note 3 to § 2B1.1 fleshes out how the district court is to calculate "loss." See generally *Stinson v. United States*, 508 U.S. 36, 38, 113 S. Ct. 1913, 123 L. Ed. 2d 598 (1993) (holding "that commentary in the Guidelines Manual that interprets

or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline"). To begin with, Application Note 3 provides that, as a general rule, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). In turn, Application Note 3 proceeds to define the phrase "actual loss." "'Actual loss,'" it explains, "means the reasonably foreseeable pecuniary harm that resulted from the offense." Id. cmt. n.3(A)(i). "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." Id. cmt. n.3(A)(iii). And "'reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id. cmt. n.3(A)(iv). Notably, Application Note 3 treats amounts recovered by a fraud victim, such as the proceeds from a foreclosure sale, as "Credits Against Loss," rather than part of the initial "actual loss" calculation. More specifically, Application Note 3 provides that "[l]oss shall be reduced . . . [i]n a case involving collateral pledged or otherwise provided by the defendant, [by] the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." Id. cmt. n.3(E)(ii). Thus, if we were to state the method for determining "loss" for purposes of § 2B1.1(b)(1) as a mathematical equation, it would be as follows: loss equals actual loss (or intended loss) minus credits against loss.

Importantly, for purposes of this appeal, the plain language of Application Note 3 makes clear that the concept of reasonable foreseeability applies only to a district court's calculation of "actual loss," and not to its calculation of the "credits against loss." Consequently, it is irrelevant in this case whether or not Crowe, at the time she negotiated the various mortgages at issue, reasonably anticipated a precipitous decline in the real estate market that might result in the original lender or successor lenders being unable to recoup their losses from the sale of pledged collateral should she default. Instead, the only foreseeability issue in this case, and the one that the district court correctly focused on, is the amount of the potential pecuniary harm that might result from Crowe's offenses, i.e., the reasonable foreseeability of the "actual loss" (rather than the "loss") that occurred in this case.

We are not the first circuit to expressly adopt this interpretation of Application Note 3 to § 2B1.1. Rather, as the government notes in its appellate response brief, this interpretation was first adopted by the Second Circuit in Turk, following the lead of the district court in _United States v. Mallory_, 709 F.Supp.2d 455 (E.D. Va. 2010). Notably, the defendants in both Mallory and Turk raised arguments similar to the ones asserted by Crowe in this appeal.

The defendant in _Mallory_, Lloyd Mallory, was convicted by a jury "of conspiring to defraud lenders into issuing mortgage loans to unqualified homebuyers, many of whom subsequently defaulted on those home loans." 709 F.Supp.2d at 455-56. "At sentencing, the principal contested issue was the calculation of actual loss pursuant to § 2B1.1." Id. at 456. Lloyd "argu[ed] that the 'credit against loss' calculation should be based not on the actual amount recovered through foreclosure sales, but rather on the amount that [he], at the time of the fraudulent acts, reasonably could have expected to be recovered from later foreclosure sales." Id. "Because [Lloyd's] fraudulent conduct occurred between 2006 and 2008, while the housing market was showing significant signs of weakness, but before the more dramatic collapse in housing prices in late 2008 and early 2009, [Lloyd] argued that he could not have foreseen that the defrauded banks would have recovered as little as they did from the foreclosure sales." Id. at 456-57. The district court rejected Lloyd's arguments, stating, in pertinent part, as follows:

> [Section] 2B1.1 treats the sale-of-collateral calculation as a separate and distinct analysis from the calculation of the reasonably foreseeable loss amount. It follows that this "credit against loss" provision does not require the amount of this credit to be reasonably foreseeable. To the contrary, the credit against loss provision emphasizes that the loss may be reduced only by the amount actually recovered or by the amount that is recoverable *at the time of sentencing*, whether or not the defendant had any idea what the collateral's value would be by that time. (citation omitted)
>
> Taken together, these provisions teach a two-step approach for calculating the loss attributable to a defendant in home loan fraud cases such as this one. The first step is to calculate the reasonably foreseeable pecuniary harm resulting from the fraud. This amount will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan, as an unqualified borrower's default is clearly a reasonably foreseeable "potential result of the offense" within the meaning of Application Note 3(A)(iv). After all, the entire purpose of loan qualification criteria is to reduce the risk to banks that debtors will default on their loans. Fraudulent misrepresentations concerning borrowers' qualifications cause banks to assume a risk of default and, as discussed below, a risk that the value of the collateral will decrease. Neither of these risks would have been assumed by the lender in the absence of fraud. Accordingly, the loss of the unpaid principal is an eminently foreseeable consequence of the fraudulent conduct. Partial recovery of this loss through seizure and sale of collateral may reduce the net loss amount through operation of the "credits against loss" provision, but it does not diminish the

foreseeability of the financial institutions' loss of the unpaid principal amounts in the first instance.

The second step in calculating the loss amount requires application of the "credits against loss" provision. In applying this provision, courts must deduct from the calculated loss the amount actually recovered or actually recoverable by the creditor from sale of the collateral. This calculation is made as of the time of sentencing and without regard for whether this amount was reasonably foreseeable by the defendant. Where the financial institutions have sold the collateral, courts should credit the amount actually recovered in the sale. Where the collateral is held by the institution at the time of sentencing, then the fair market value of the collateral at the time of sentencing is properly credited instead. By operation of Application Note 3(E)(ii), it is irrelevant whether the diminished value of the credit against loss was reasonably foreseeable to defendant, as the loss of the entire amount of unpaid principal was a reasonably foreseeable potential consequence of defendant's conduct. Accordingly, defendant is only entitled to a credit against loss in the amount actually recovered by the banks from sale of the subject properties.

This approach—requiring foreseeability of the loss of the unpaid principal, but not requiring foreseeability with respect to the future value of the collateral—is not merely the best reading of § 2B1.1; it is also necessary to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct. This is so because among the risks that a bank assumes in agreeing to issue a home loan is the risk that in the event of default, the foreclosure sale value of the home will be insufficient to allow recovery of the principal value due to market downturns or other events. In the lending institution's judgment, this risk is warranted only if the borrower satisfies certain employment, income, and asset requirements that render the likelihood of foreclosure sufficiently remote.

Thus, by fraudulently misstating these factors, defendant and his coconspirators induced banks to assume the risk of a market downturn when the banks otherwise would not have assumed this risk with respect to the subject properties. Accordingly, irrespective of whether defendant could have predicted the foreclosure sale value of the subject properties at the time of sentencing, he should be held to account for the banks' actual losses as he fraudulently induced them to assume the risk that the value of the homes would decrease—a risk that was ultimately realized. Put another way, a

> defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct.

Id. at 458-59.

The defendant in _Turk_, Ivy Woolf Turk, "pleaded guilty to a single count of conspiracy to commit mail and wire fraud in violation of 18 U.S.C. §§ 1341, 1343, 1349," and was sentenced to "60 months' imprisonment and ordered . . . to pay $29,660,192.36 in restitution to the victims of the mortgage fraud she perpetrated." Id. at 744. On appeal, Turk's "main argument [wa]s that the district court . . . erred in calculating the amount of loss that [her] fraud caused." *Id.* More specifically, Turk argued "that the loss amount should have been treated as zero because the properties in which her victims thought they were investing arguably had some market value at the time her fraud was discovered." _*Id*_. at 748. The Second Circuit concluded that Turk's "argument fail[ed] because of its faulty premise, namely, that the victims' 'loss' [wa]s the decline in value of what was promised as collateral (i.e., the buildings)." Id. "Rather," the Second Circuit concluded, "their loss [wa]s the principal value of the loans they made to . . . Turk which were never repaid and which the buildings were supposed to have collateralized but never did." Id. In other words, the Second Circuit held, "the victims' *loss* was the unpaid principal, and . . . the decline in value in any purported collateral need not have been foreseeable to . . . Turk in order for her to be held accountable for that entire loss." *Id*. at 749 (italics in original).

In reaching these conclusions, the Second Circuit cited with approval, and ultimately adopted, the interpretation of § 2B1.1 and Application Note 3 outlined in Mallory. *Id*. at 750. And, the Second Circuit emphasized, "[t]o accept . . . Turk's argument would be to encourage would-be fraudsters to roll the dice on the chips of others, assuming all of the upside benefit and little of the downside risk." Id.

We agree with and adopt the reasoning expressed by the courts in _*Mallory*_ and _*Turk*_. And, applying that reasoning in this case, conclude that the reasonably foreseeable pecuniary harm resulting from Crowe's fraud includes "the full amount of unpaid principal on the fraudulently obtained loan[s]." _*Mallory*_, 709 F.Supp.2d at 458. That is because Crowe, by fraudulently misrepresenting key information, including her job and income, "cause[d] [the] banks [at issue] to assume a risk of default," and "the loss of the unpaid principal [on each loan] [wa]s an eminently foreseeable consequence of [her] fraudulent conduct." *Id*.

As a final matter, we pause briefly to address two of our prior cases that involved loss calculations under § 2B1.1. In the first of those cases, _*United States v. Mullins*_, 613 F.3d 1273, 1291 (10th Cir. 2010), the district court "calculated the

financial loss attributable to [the defendant's] fraud" for purposes of § 2B1.1 by taking "the outstanding balances due on sixteen defaulted loans [the defendant] assisted in procuring and subtracted from each the foreclosure sale price when [the United States Department of Housing and Urban Development (HUD)] liquidated the mortgaged property." On appeal, the defendant challenged this method of loss calculation, arguing in part "that the proceeds HUD took in from liquidation sales . . . were unreasonably low and thus d[id]n't reflect the 'reasonably foreseeable pecuniary harm' attributable to her fraud." *Id*. at 1292. In support, the defendant noted that the appraisals conducted by HUD in apparent preparation for the liquidation sales were "significantly lower" than the appraisals that were first conducted when the defendant's clients purchased the properties. Id. The panel rejected this argument on the merits, concluding that "the district court's finding . . . that HUD's sale prices reflected the reasonably foreseeable pecuniary harm caused by [the defendant's] fraud" was not clearly erroneous. *Id*. at 1293.

Clearly, our conclusion in *Mullins* rests on the implicit assumption that the concept of reasonable foreseeability applies to a district court's calculation of the credits against loss under § 2B1.1. But that threshold issue was neither placed directly at issue by the parties in Mullins nor explicitly decided by the panel. As a result, Mullins does not represent "binding precedent on this issue." *United States v. Garcia-Caraveo*, 586 F.3d 1230, 1234 (10th Cir. 2009); see *United Food & Commercial Workers Union, Local 1564 v. Albertson's, Inc.*, 207 F.3d 1193, 1199-1200 (10th Cir. 2000) (refusing to grant precedential weight to a jurisdictional question assumed, but not explicitly decided, by a prior panel). In other words, "under our rule of deference to prior panel decisions, there is no holding on" the threshold issue "to which we must defer." *United Food*, 207 F.3d at 1200.

*4 As the government correctly observes, Mullins was issued prior to both Mallory and Turk.*

The concept of reasonable foreseeability was also mentioned briefly in *United States v. Washington,* 634 F.3d 1180 (10th Cir. 2011). There, the defendant argued, in part, "that the loss realized in the sale of the properties [at issue] [wa]s not attributable to his fraud and, therefore, not properly included in the loss calculation." *Id. at 1185*. We rejected that argument, holding that "in a mortgage fraud scheme such as this, the loss is not the decline in value of the collateral; the loss is the unpaid portion of the loan as offset by the value of the collateral." Id. We explained that "[a]lthough the victims of such a scheme may be able to recoup some of their loss by selling the collateral, the initial transactions would not have occurred let alone in the amount they did, but for perpetration of the fraud." Id. In short, our holding in *Washington* is entirely consistent with the interpretation of *§ 2B1.1* that we explicitly

adopt in this opinion. Indeed, in Washington we quoted with approval the Second Circuit's statement in Turk "that 'a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit. At any given time, the buildings in this case were nothing more than insulation against loss.'" Id. (quoting Turk, *626 F.3d at 751*).

To be sure, we also quoted in Washington the following statement from the

> Eighth Circuit's decision in United States v. Parish, *565 F.3d 528 (8th Cir. 2009)*: "'[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable.'" 634 F.3d at 1185 (quoting Parish, 565 F.3d at 535). And Parish itself effectively held that the concept of reasonable foreseeability applies to a district court's calculation of the credits against loss under § 2B1.1. Parish, 565 F.3d at 535. But we do not read Washington's quotation of Parish as an adoption of the Eighth Circuit's view of foreseeability as it relates to credits against loss. To the contrary, the other relevant statements in Washington clearly suggest otherwise. And, in any event, like Mullins, that precise issue was neither placed directly at issue by the parties nor explicitly decided by the panel in Washington.

In conclusion, we hold that, in calculating the amount of "loss" for purposes of *U.S.S.G. § 2B1.1(b)*, the concept of reasonable foreseeability applies only to a district court's calculation of "actual loss," and not to its calculation of the "credits against loss." Consequently, we reject Crowe's assertion that her sentence was procedurally unreasonable because the district court did not determine whether the proceeds ultimately realized from the foreclosures were reasonably foreseeable to her.

*b) Amounts paid by successor lenders to the original lenders*

Crowe also argues that "[t]he district court's calculation of loss [wa]s . . . incorrect under United States v. James, *592 F.3d 1109 (10th Cir. 2010)*." Aplt. Br. at 8. James, Crowe argues, "holds that the loss of successor lenders is measured by 'the difference between what they paid the original lenders for the loans (less principal repayments by borrowers, if any) and what they received for the properties at the foreclosure sales, plus reasonably foreseeable expenses relating to the foreclosure proceedings.'" *Id.* at 9 (quoting James, 592 F.3d at 1115). "Because the Government [in this case] did not present evidence about what the successor lenders paid for the mortgages," Crowe argues, "this Court should remand with instructions to use a loss amount of zero for purposes of [*U.S.S.G. §] 2B1.1*." Id.

> As the government notes in its appellate response brief, however, Crowe did not raise this argument before the district court. Instead, Crowe argued only that the successor lenders were not reasonably foreseeable victims. Consequently, Crowe's argument is subject to review only for plain error. See United States v. Romero, 491 F.3d 1173, 1177-78 (10th Cir. 2007) (discussing the requirement of raising procedural objections in front of the sentencing court). "We find plain error only when there is (1) error, (2) that is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id. at 1178*. "The plain error standard presents a heavy burden for an appellant, one which is not often satisfied." Id.
>
> We conclude, for two reasons, that no error, let alone plain error, occurred in this case. First, the holding in *James* is inapplicable to Crowe's appeal because of a key factual difference in the two cases: in James, the district court "refused to consider the successor lenders as victims" based on its factual finding that the decision to resell the original loans was not foreseeable to the defendant (a finding, we note, that was not challenged by the government on appeal); in Crowe's case, the district court made no such finding. Second, and relatedly, both James and our more recent decision in United States v. Smith, 705 F.3d 1268 (10th Cir. 2013), support the proposition that "where losses to both original and successor lenders is foreseeable," a district court can calculate loss simply by subtracting the foreclosure sales price from the amount of the outstanding balance on the loan. *705 F.3d at 1276*. In other words, "the number of lenders involved and the amount of profit made by the original lender or any intermediate lenders is mathematically irrelevant to the calculation of" loss under *§ 2B1.1*. Id. (internal quotation marks omitted).

*Crowe* is the most recent pronouncement of how to go about determining the amount of the "actual loss" suffered by the lending institution. In this regard Crowe instructs that:

> Section "2B1.1(b) increases a defendant's base offense level for fraud according to the amount of the loss." *United States v. Washington*, 634 F.3d 1180, 1184 (10th Cir. 2011). "The court is instructed to use the greater of actual or intended loss." Id. (citing U.S.S.G. § 2B1.1 cmt. n.3(A)). "If the loss is not reasonably determinable, then a court must use the gain that resulted from the fraud as an alternative measure." Id. (quoting U.S.S.G. § 2B1.1 cmt. n.3(B)). "The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." Id. (internal quotation marks omitted).

In determining the actual loss, Crow also instructs that, "the reasonably foreseeable pecuniary harm resulting from Crowe's fraud includes "the full amount of unpaid principal on the fraudulently obtained loan[s]." Next we must deduct from this number the "credit against loss."

> This calculation is made as of the time of sentencing and without regard for whether this amount was reasonably foreseeable by the defendant. Where the financial institutions have sold the collateral, courts should credit the amount actually recovered in the sale. Where the collateral is held by the institution at the time of sentencing, then the fair market value of the collateral at the time of sentencing is properly credited instead.

At each and everyone of the foreclosure sales in this case, the lender, at the time of the foreclosure auction, bid in the full amount of their mortgages, plus the costs of foreclosure, and NO DEFICIENCY JUDGMENT was taken. By statute in Kansas, a lender is required, prior to the foreclosure auction to obtain an appraisal of the real property which is the subject of the foreclosure suit. They are then required, at the time of the sale to bid in either 90% of the appraised value of the real estate or the full amount of their lien, which ever is smaller. As counsel understands it, this is an underwriting requirement, which is required by the entity providing the mortgage insurance. As *Crowe* teaches, "the loss may be reduced only by the amount actually recovered or by the amount that is recoverable *at the time of sentencing*, whether or not the defendant had any idea what the collateral's value would be by that time." In the instant case that is the amount bid in at the foreclosure sale, not what the bank later sold the property for months after it acquired the same through the Sheriff's auction.

In this regard, it should be noted that in *Crowe* you were dealing with a "Deed of Trust" situation, and not a mortgage. This is because the *Crowe* case took place in Colorado, where a

"Deed of Trust" is used in lieu of a mortgage, as is the case in Kansas. The principal difference being that upon notice to the debtor in a deed of trust situation, is that the title to the real property automatically reverts to the lender, and the debtor has a 85 day window of time in which to "cure" and regain title to the property. Even after this the debtor has 5 days to redeem the property, by paying off the underlying promissory note to the creditor. If the debtor does not redeem within the five days, then other subordinate creditors have a 10 day right of redemption. In Kansas, a foreclosure action must be filed and a public auction conducted, before a creditor can acquire title to the mortgaged real estate. (See K.S.A. 60-2401 *et seq*.)

A "Deed of Trust" is defined as: "Deed of Trust. An instrument in use in many states, taking the place of and serving the uses of a common-law mortgage, by which the legal title to real property is paced in one or more trustees, to secure repayment of money or the performance of other conditions." Blacks Law Dictionary Revised Fourth Edition, p. 503

This distinction is important, because in the *Crowe* case a deed of trust was executed and given to a third party trustee to hold. Assuming that repayment occurred in a timely manner, and the promissory note was fully honored, that deed would never be recorded, and would be returned to the original grantor or his assignee. However, in the event of default, the deed is given to the grantee and once recorded conveys title to the real property to the grantee. That is very different than what happened here.

In this case a check was issued to the Clerk of the District Court for Sedgwick County, Kansas, in the amount bid by the successful bidder at the foreclosure sale. In each instance, the successful bidder was the institution holding the foreclosed mortgage. In each instance, the banks

continued to hold the subject property for many months after the foreclosure sale was completed, some as long as 22 months, before LISTING THE PROPERTY FOR SALE. At that time the BOP or BROKER OPINION PRICE was determined by the LISTING BROKER, this, in turn, determined the price at which the property would be listed by the banks. At the time that these properties were sold, this was not a formal appraisal as is now required (under current underwriting practices), but is instead just the listing brokers opinion as to what the listing price should be.

It should be noted that on many of the properties which are the subject of this litigation, the listing broker, the seller's agent and the buyer's agent were all the same person. It should also be noted that these properties were listed for extremely short periods of time before they were sold, at least one was listed for less than one day before it was sold at a considerable discount to the listing agent's buyer. This means that the properties were not marketed, but simply listed and sold quickly without any effort to sell the same in a commercially reasonable manner.

For all of these reasons, the Court should not use the dollar value received by the bank from its subsequent sale of the real property to a third party, after months of deterioration, only to be followed by a listing that is not open for more than a few days, and sells for far less than the appraised value of the property. In *Crowe* there was no foreclosure action, but instaed a deed of trust, followed by a sale to a third party.

Here the Court should take the amount of the original loan, minus any monies received by the banks through the sale of this property. In this regard please see U.S.S.G. § 2B1.1, Application Note 3, which provides as follows:

3. Loss Under Subsection (b)(1). This application note applies to the determination of loss under subsection (b)(1).

(A) General Rule. Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

(i) Actual Loss. "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.

(ii) Intended Loss. "Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

(iii) Pecuniary Harm. "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

(iv) Reasonably Foreseeable Pecuniary Harm. For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

(v) Rules of Construction in Certain Cases. In the cases described in subdivisions (I) through (III), reasonably foreseeable pecuniary harm shall be considered to include the pecuniary harm specified for those cases as follows:

(I) Product Substitution Cases. In the case of a product substitution offense, the reasonably foreseeable pecuniary harm includes the reasonably foreseeable costs of making substitute transactions and handling or disposing of the product delivered, or of retrofitting the product so that it can be used for its intended purpose, and the reasonably foreseeable costs of rectifying the actual or potential disruption to the victim's business operations caused by the product substitution.

(II) Procurement Fraud Cases. In the case of a procurement fraud, such as a fraud affecting a defense contract award, reasonably foreseeable pecuniary harm includes the reasonably foreseeable administrative costs to the government and other participants of repeating or correcting the procurement action affected, plus any increased costs to procure the product or service involved that was reasonably foreseeable.

(III) Offenses Under *18 U.S.C. § 1030*. In the case of an offense under *18 U.S.C. § 1030*, actual loss includes the following pecuniary harm, regardless of whether such pecuniary harm was reasonably foreseeable: any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other damages incurred because of interruption of service.

(B) Gain. The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.

(C) Estimation of Loss. The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference. See *18 U.S.C. § 3742(e)* and (f).

The estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

(i) The fair market value of the property unlawfully taken, copied, or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

(ii) In the case of proprietary information (e.g., trade secrets), the cost of developing that information or the reduction in the value of that information that resulted from the offense.

(iii) The cost of repairs to damaged property.

(iv) The approximate number of victims multiplied by the average loss to each victim.

(v) The reduction that resulted from the offense in the value of equity securities or other corporate assets.

(vi) More general factors, such as the scope and duration of the offense and revenues generated by similar operations.

(D) Exclusions from Loss. Loss shall not include the following:

(i) Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.

(ii) Costs to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense.

(E) Credits Against Loss. Loss shall be reduced by the following:

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

(ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

(iii) Notwithstanding clause (ii), in the case of a fraud involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.

In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.

(F) Special Rules. Notwithstanding subdivision (A), the following special rules shall be used to assist in determining loss in the cases indicated:

(i) Stolen or Counterfeit Credit Cards and Access Devices; Purloined Numbers and Codes. In a case involving any counterfeit access device or unauthorized access device, loss includes any unauthorized charges made with the counterfeit access device or unauthorized access device and shall be not less than $ 500 per access device. However, if the unauthorized access device is a means of telecommunications access that identifies a specific telecommunications instrument or telecommunications account (including an electronic serial number/mobile identification number (ESN/MIN) pair), and that means was only possessed, and not used, during the commission of the offense, loss shall be not less than $ 100 per unused means. For purposes of this subdivision, "counterfeit

access device" and "unauthorized access device" have the meaning given those terms in Application Note 7(A).

(ii) Government Benefits. In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $ 100 but fraudulently received food stamps having a value of $ 150, loss is $ 50.

(iii) Davis-Bacon Act Violations. In a case involving a Davis-Bacon Act violation (i.e., a violation of *40 U.S.C. § 3142*, criminally prosecuted under *18 U.S.C. § 1001*), the value of the benefits shall be considered to be not less than the difference between the legally required wages and actual wages paid.

(iv) Ponzi and Other Fraudulent Investment Schemes. In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme).

(v) Certain Other Unlawful Misrepresentation Schemes. In a case involving a scheme in which (I) services were fraudulently rendered to the victim by persons falsely posing as licensed professionals; (II) goods were falsely represented as approved by a governmental regulatory agency; or (III) goods for which regulatory approval by a government agency was required but not obtained, or was obtained by fraud, loss shall include the amount paid for the property, services or goods transferred, rendered, or misrepresented, with no credit provided for the value of those items or services.

(vi) Value of Controlled Substances. In a case involving controlled substances, loss is the estimated street value of the controlled substances.

(vii) Value of Cultural Heritage Resources or Paleontological Resources. In a case involving a cultural heritage resource or paleontological resource, loss attributable to that resource shall be determined in accordance with the rules for determining the "value of the resource" set forth in Application Note 2 of the Commentary to § 2B1.5.

(viii) Federal Health Care Offenses Involving Government Health Care Programs. In a case in which the defendant is convicted of a Federal health care offense involving a Government health care program, the aggregate dollar amount of fraudulent bills

> submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, i.e., is evidence sufficient to establish the amount of the intended loss, if not rebutted.
>
> (ix) Fraudulent Inflation or Deflation in Value of Securities or Commodities. In a case involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity, there shall be a rebuttable presumption that the actual loss attributable to the change in value of the security or commodity is the amount determined by--
>
> (I) calculating the difference between the average price of the security or commodity during the period that the fraud occurred and the average price of the security or commodity during the 90-day period after the fraud was disclosed to the market, and
>
> (II) multiplying the difference in average price by the number of shares outstanding.
>
> In determining whether the amount so determined is a reasonable estimate of the actual loss attributable to the change in value of the security or commodity, the court may consider, among other factors, the extent to which the amount so determined includes significant changes in value not resulting from the offense (e.g., changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events).

Therefore the general rule is, " Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss." Therefore the Court is required to determine both the "actual loss" and the "intended loss" in order to properly apply U.S.S.G. § 2B1.1 correctly. Here the Defendant respectfully submits that the actual loss as to each of the properties in question was zero. This is evinced by the fact that the successful bidder paid into the Clerk of the District Court for Sedgwick County, Kansas, the amount of their bid. On every piece of real estate involved the amount bid in by the successful bidder was the full amount of the Judgment entered by the District Court. This is evinced by the attached Sheriff's deeds, which show the amount bid in on several of these properties.

It is further evinced by the fact that in every single one of these foreclosures no deficiency judgment was entered.

The amount of the judgment entered by the District Court was for the unpaid principal amount of the loan, plus accrued interest and any penalties called for in the contracts, as well as the costs of the action, costs of the Sheriff's auction, and costs required to proceed in foreclosure. Under U.S.S.G. § 2B1.1, Application Note 3(D)(3)(i) provides that in determining the actual loss:

> (D) Exclusions from Loss. Loss shall not include the following:
>
> (i) Interest of any kind, finance charges, late fees, penalties, amounts based on an agreed-upon return or rate of return, or other similar costs.

Therefore, the amount of money paid in at the Sheriff's auction is not the actual loss, but is actually much greater than the actual loss, because of all the "excluded" items which go into the judgment rendered in the foreclosure proceedings. Assuming the accuracy of that statement, it would mean that the banks in question actually received more money at the Sheriff's auction than this Court can consider in determining the loss.

This is important because of U.S.S.G. 2B1.1, Application Note 3(E)(ii), which provides as follows:

> (ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

Here the amount recovered at the time of the foreclosure sale or sheriff's auction, was actually in excess of the actual loss. Therefore, there was no actual loss.

Where the actual loss is less than the intended loss, then the Court must look to the intended loss in determining what figure to use in applying U.S.S.G. § 2b1.1(b). Here the intended loss is approximately $62,000.00. While paragraph 126 of the PSI Report states that:

> 126. **Specific Offense Characteristics:** the actual loss caused by the defendant's participation in the instant offense was more than $200,000.00 and less than $400,000.00. The offense level is increased by 12. USSG §2B1.1(b)(1)(G). +12

Defendant objected to this increase in his offense level by 12 levels, as the loss is not correctly calculated in the balance of the PSI Report. (See Defedant's objections to PSI report, Objection #11.) If the Defendant's valuation of the actual loss is used, i.e. zero. that would result in no increase in his offenses level. However, USSG § 2B1.1, and in particular, Application Note 3, requires an alternative to the actual loss be used, if it is greater than the actual loss, it provides that the Court should use either the "actual loss" or the "intended loss," whichever is greater.

Here a calculation of the intended loss is quite simple, the total amount of the loans in this case for all of the houses, was approximately $470,000.00. See footnote 12 to the PSI report at page 28. For the sake of argument, one could simply multiply this figure times 17% as that was the amount of the intended loss. This would make the "intended loss," $79,900.00.

However, this calculation, ignores the central purpose of this conspiracy, which was to qualify buyers as "owner occupants" of the property which was being purchased, not as investors in rental properties. The purpose for doing so was that an investor must put 20% of the purchase price down as a down payment, whereas an "owner occupant is only required to make a down payment of 3%. The difference in these two figures is 17%. 17% x 470,000.00 = 79,900.00.

This calculation should not be used because, at least two of the homes, one purchased by Mr. Henry Pearson, Sr., and one purchased by Bruce Dykes, were in fact occupied as the primary residence of each Co-Defendant. These two homes had a combined purchase price of well in excess of $100,000.00. Therefore, they should not be included in this calculation, because as to those two properties, the statement that they were going to be owner occupied was in fact true. If we reduce the amount of the purchase price of the various homes by this amount, we have a net purchase price of approximately $370,000.00 x 17% = $62,900.00. This figure is greater than $30,000.00, but less than $70,000.00, which pursuant to USSG § 2B1.1(b)(1)(D), would require a 6 level increase in the Defendant's offense level rather than a 12 level increase as is currently contemplated in paragraph #126 of the PSI report. Using this calculation avoids the necessity of trying to determine which sale controls, the Sheriff's auction or the subsequent sale to a third party.

The Defendant has not here contested, nor has he objected to the four level increase for his "Role in the Offense." He readily admits that he is the common denominator in all of these transactions. Therefore, the defense suggests that the calculation should be as follows:

| | |
|---|---|
| Base Offense Level | + 7 |
| Adjustment for Role in the Offense | + 4 |
| Adjustment for dollar amount involved | + 6 |
| Acceptance of Responsibility | - 3 |
| TOTAL OFFENSE LEVEL | 14 |

At a level 14, with a criminal history of II, the advisory guideline sentencing range would be not less than 18 nor more than 24 months. Defendant respectfully argues that his sentence should

be at the low end of that range, as the range already takes into account his prior criminal history and the fact that he was on probation at the time of many of the acts giving rise to this case.

The Code section dealing with the imposition of sentence is 18 USC § 3553. It provides in pertinent part, at 18 USC § 3553(a), as follows:

> **§ 3553. Imposition of a sentence**
>
> (a) Factors to be considered in imposing a sentence. The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for--
>
> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--
>
> (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress

(regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

(B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.[;]

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Rather than go through each of these factors at this time to discuss how they should impact the Defendant's sentence herein, counsel will instead save this argument for the sentencing hearing. Defendant would simply point out at this time that many of the above factors weigh in favor of a mitigated sentence herein.

For all these reasons the Defendant asks that this Court temper its sentencing decision with mercy remembering what Abraham Lincoln once said, “I have always found that mercy bears richer fruits than strict justice.” Further, as William Shakespear put it:

> “The quality of mercy is not strain'd,
> It droppeth as the gentle rain from heaven
> Upon the place beneath: it is twice blest;
> It blesseth him that gives and him that takes:
> 'Tis mightiest in the mightiest: it becomes
> The throned monarch better than his crown;
> His sceptre shows the force of temporal power,
> The attribute to awe and majesty,
> Wherein doth sit the dread and fear of kings;
> But mercy is above this sceptred sway;
> It is enthroned in the hearts of kings,
> It is an attribute to God himself;
> And earthly power doth then show likest God's
> When mercy seasons justice.”
> —

William Shakespeare, *The Merchant of Venice*

Respectfully submitted:

LAW OFFICE OF ROGER L. FALK, P.A.

By: /s/ Roger L. Falk

Roger L. Falk, Ks.Sp.Ct. #9972
301 W. Central Ave.
Wichita, Kansas 67202
Telephone: (316) 265-5115
Fax: (316) 265-5183
E-mail: roger_falk@sbcglobal.net
Attorney for Defendant
Manjur Alam

**CERTIFICATE OF SERVICE**

I, Roger L. Falk, the undersigned, do hereby certify that a true and correct copy of the above and foregoing Sentencing Memorandum was served upon opposing counsel on this 9th day of April, 2014, by the Court's ECF system, upon the filing of this Sentencing Memorandum objections with the Clerk of the District Court, to: Mr. Aaron L. Smith, Asst. U.S. Attorney.

/s/ RogerL. Falk