**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No. 13-10057-01 |
| | ) | |
| MANJUR ALAM, | ) | |
| | ) | |
| Defendant. | ) | |

**SENTENCING MEMORANDUM and RULE 32(h) NOTICE**

Before the court are the following:

1. Presentence report (Doc. 121);

2. Defendant's 30-page objections to PSR (Doc. 123);

3. Defendant's 36-page sentencing memorandum (Doc. 124);

4. Government's response to objections (Doc. 125);

5. Court's letter of June 19, 2014 (Doc. 129);

6. Government's response (Doc. 130); and

7. Defendant's reply (Doc. 128).

A hearing was held on April 21, 2014. The parties proceeded by proffer and argument.

## Introduction

In Case No. 05-10253, defendant, along with several co-defendants, was charged with various offenses, including wire fraud and conspiracy generally relating to HUD fraud. Defendant entered a plea to conspiracy to defraud HUD and was sentenced to probation. Undeterred (or perhaps emboldened) by this lenient sentence, defendant and six co-defendants began committing the acts giving rise to this case. The PSR describes the criminal conduct in (unobjected-to)

detail. The overall scheme is set out in PSR paragraphs 31-33 and 35-40 as follows:

> 31. The defendants in this scheme defrauded FDIC mortgage lenders, Fannie Mae and Freddie Mac and the United States Department of Housing and Urban Development (HUD) by utilizing nominal buyers to purchase homes that were HUD qualified. This scheme to defraud submitted materially false loan applications to lenders and created false supporting documentation that opened accounts at financial institutions for the sole purpose of receiving and transferring proceeds from the scheme.
>
> 32. At the time of the scheme, Manjur Alam had his realtor license suspended, was on probation after a Federal conviction, and was prohibited from participating in any federal programs, including housing programs. Mr. Alam used "nominal sellers" to purchase homes and flip the properties to "nominal buyers." Mr. ALAM lured the "nominal sellers" with promises of quick and easy profits, while he recruited "nominal buyers" with the prospect of using the houses as investments while promising them kickbacks.
>
> 33. Bruce Dykes, Christopher Ginyard, Henry Pearson, Sr., Henry Pearson, Jr., Steven Pelz, and Janice Young were "nominal buyers" recruited by Mr. ALAM to purchase homes as rental properties. None of the nominal buyers used the homes as their primary residence, yet each indicated in the loan application that the homes would be a primary residence. Each of these defendants were unqualified to receive mortgage loans for the homes purchased, and each of these defendants made false statements in their applications for those loans.
>
> 35. It was further part of the scheme that Mr. Alam recruited sellers from his homeland of Bangladesh. Manjur Alam identified properties for the sellers to purchase and flip to buyers. Mr. ALAM told the sellers he would do most of the repairs on the properties and pay for the repairs before the sale. Manjur Alam would bill the sellers at the time of closing for the repairs, and he and the sellers would split the expenses and profits at the time of closing. Manjur Alam would not fully document the repair expenses, often inflating the expenses, and thereby taking an inflated share of the profit. Mr. Alam would also create fictitious invoices for repairs that were not completed. Manjur Alam only made minor cosmetic repairs leaving many properties with mechanical or structural issues.
>
> 36. Manjur Alam recruited the "nominal buyers," often having identified concurrently with the "nominal seller." Mr. Alam told the "nominal buyers" they could be landlords

of the properties and Mr. Alam would help by finding renters. Manjur Alam promised to make payments to the buyers for purchasing the houses. Mr. Alam assisted the "nominal buyers" in obtaining loans to purchase the properties. Manjur Alam prepared the paperwork, including false Uniform Residential Loan Application(s) (URLA) for the "nominal buyers". Mr. Alam identified the property for them to purchase, and directed the "nominal buyers" to loan officers. Manjur Alam provided other false paperwork to the lending institutions to facilitate the "nominal buyers" receiving the loans. Mr. Alam guided each "nominal buyer" through the purchase process, acting as the buyer and seller agent. Mr. Alam had his realtor license suspended in July 2007, and falsely represented his wife as the realtor while, in fact, he acted as the realtor.

37. Manjur Alam instructed each "nominal buyer" to apply for multiple loans, with the exception of Henry Pearson, Sr. and Janice Young. Henry Pearson, Sr. and Janice Young only made one loan application. However, each of the uniform residential loan applications (URLAs) indicates the borrower(s) intended to occupy the residence as a primary residence, and the nominal buyers signed the URLAs and occupancy certifications indicating the same. The nominal buyers did so at the direction of Manjur Alam. The nominal buyers did not occupy the residences as primary residences, but intended to use them as rental properties in accordance with the scheme created by Mr. Alam.

38. The lenders require Verification of Employment (VOEs) to insure the borrowers are employed and able to make monthly mortgage payments. Mr. Alam caused false VOEs to be created for the "nominal buyers" and be submitted to the lending institutions during the loan application.

39. The lenders require Verifications of Rent (VORs) to determine if borrowers can afford mortgage payments. Manjur Alam caused false VORs to be created for the "nominal buyers" and be submitted to the lending institutions during the loan application.

40. Prior to the nominal buyers closing on the properties, Mr. Alam and/or the nominal buyers would submit invoices for repairs to title companies for property improvements. The invoices were from companies that did not exist, or for repairs that were not completed or vastly overstated. Manjur Alam would represent the false or inflated repair expenses to the "nominal sellers" as actual expenses. Thus, Mr. Alam would take a greater share of the profits of the home sales. Manjur Alam would take his portion of the profits after expenses, and would also take payment for the false or inflated repairs, using some of those funds as kickbacks payments to his "nominal buyers".

Ultimately, defendant and the codefendants entered pleas of guilty. Defendant pled to violations of 18 U.S.C. § 1343 and 1349. A PSR was prepared, to which defendant filed prolix objections, all but one of which relate to loss calculation for purposes of U.S.S.G. 2B1.1(b)(1) and Application Note 3. Defendant's argument, presented at length at the April 21 hearing and reprised in Doc. 131, essentially is that actual loss cannot be determined, intended loss is $170,000, and despite his extensive criminal conduct he should receive a minimal sentence.

The parties agree that this court must follow United States v. Crowe, 735 F.3d 1229 (10th Cir. 2013). Nevertheless, defendant seeks to materially distinguish Crowe because he says that Colorado law "requires that the collateral goes to the bank in trust and then the bank is under duty to dispose the collateral in a commercially reasonable manner at a sale, and the debtor can then object to the reasonableness of the sale," whereas Kansas law does not require the sale be "commercially reasonable." (Doc. 131 at 2 and 3). Defendant, in his extensive submissions, has not cited Colorado law in support of this argument and nowhere does the Crowe opinion discuss Colorado law, nor does it suggest that a determination of loss somehow requires application of state law. In any event, the court finds the argument to be unpersuasive and irrelevant to the question of loss determination as outlined in the Tenth Circuit cases.

Crowe focused on whether the concept of reasonable foreseeability applies to the calculation of "credits against loss" under § 2B1.1(b). Chief Judge Briscoe concluded that it doesn't, rejecting Crowe's argument that she could not have foreseen the 2008 collapse in the

real estate market. No such foreseeability argument is made here; nor can it be.  It is absurd to think that when defendant deliberately set out to commit his second real estate fraud scheme, he foresaw, reasonably or otherwise, that when he was caught and convicted, he could successfully claim that the lenders suffered minimal or no loss because, when the properties were foreclosed and subsequently sold, Kansas law, to use defendant's words, does not require the sales to be "conducted in a commercially reasonable manner."  (Doc. 131 at 3). The "reasonably foreseeable pecuniary harm" in this case is that defendant knew that his co-conspirators could not and would not be able to pay the loans he helped them fraudulently obtain and, as a result, the lenders would foreclose.  (For example, as noted in unobjected-to paragraph 60 of the PSR, defendant told co-conspirator Dykes to lie and tell all the lenders that he intended to make the home his residence.  Dykes, at defendant's direction, purchased four homes.)  Foreclosure was not a "potential result;" it was the only result of defendant's conduct.

Defendant's other arguments are legally flawed and, in some cases, nonsensical. He attacks the documentation supplied by the government as "inadmissible hearsay and a violation of the confrontation clause."  (Doc. 131 at 7).  He cites no authority, undoubtedly because there is none.  Fed. R. Evid. 1101(d)(3) states that the rules of evidence do not apply to sentencing and the court is unaware of any controlling decision which makes the confrontation clause applicable, either.  Notably, defendant apparently sees no "hearsay" problem in using the exhibits he attaches to Doc. 131.

Defendant makes unsupported claims that the "lenders allowed

these homes to sit vacant for many months and deteriorate in value before marketing them . . ;" that the realtors acted as both the seller's and buyer's agent and that the lenders bought the homes at the foreclosure sale without any "reasonable or legal justification. . ." which he boldly asserts is "not fair play." (Id. at 3).  The undersigned has heard a lot of defendant's arguments over the years but this is the first time that a criminal has argued that his punishment should be lessened because his victims did not "play fair." This is akin to a bank robber who claims that the teller did not "play fair" because she put an exploding dye pack in the bag with the money!

Finally, defendant argues that this is an "intended loss" case because:

> Assuming the accuracy of the Government's total for the mortgages in question, and using all of the properties financed with this common "scheme" that amount would be approximately $170,168.00, or 17% x the $1,000,906.00 financed. Defendant does not [concede] the accuracy of this dollar figure ($1,000,906.00), and has set forth his objections above. Further, at least four of the homes were owner occupied, and should be excluded from these computations, exclusion of these four homes would reduce the amount of the loans to less than $800.000.00. However, we agree that $1,000,906.00 is the amount of all of the loans in this case, charged and uncharged, however, it is believed that those figures are not the "actual loss," pursuant to Crowe. The figure of 17% is used because that was the amount of the "intended loss."
>
> Had the purchasers honestly shown that they were not going to live in these properties, but were instead going to use them as rental properties, the Co-Defendants would have been required to come up with 20% of the purchase price as a down payment on the same, and the banks would have only loaned 80% of the appraised value of the real estate. By fraudulently claiming that these homes would be "owner occupied" the Co-Defendants were only required to make a 3% down payment, thereby cheating the banks out of the 17% of the down payment that would otherwise be required to obtain such a loan.

(Doc. 131 at 15).

The reason the "purchasers" (i.e. codefendants) were not "honest" is because defendant told them not to be honest with the lenders. This was an integral part of defendant's scheme to defraud.

Defendant has made it very difficult for the court to appreciate and take seriously his objections and arguments. Nevertheless, the court will proceed to rule on defendant's objections to the PSR.

## Applicable Law

The relevant portions of Application Note 3 are:

> 3.  <u>Loss Under Subsection (b)(1)</u>- This application note applies to the determination of loss under subsection (b)(1).
>
> (A)  <u>General Rule</u> – Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.
>
> > (i)  <u>Actual Loss</u> – "Actual loss" means the reasonably foreseeable pecuniary harm that resulted from the offense.
> >
> > (ii) <u>Intended Loss</u> – "Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).
> >
> > (iii) <u>Pecuniary Harm</u> – "Pecuniary harm" means harm that is monetary . . .
> >
> > (iv) <u>Reasonably Foreseeable Pecuniary Harm</u> – For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.
>
> * * *
>
> (C)  <u>Estimation of Loss</u> – The court need only make a reasonable estimate of the loss . . . The estimate of the loss shall be based on available information. . .
>
> * * *
>
> (E)  <u>Credits Against Loss</u> – Loss shall be reduced by the following:
>
> > (iii) Nothwithstanding clause (ii), in the case of a fraud

-7-

>involving a mortgage loan, if the collateral has not been disposed of by the time of sentencing, use the fair market value of the collateral as of the date on which the guilt of the defendant has been established, whether by guilty plea, trial, or plea of nolo contendere.
>
>In such a case, there shall be a rebuttable presumption that the most recent tax assessment value of the collateral is a reasonable estimate of the fair market value. In determining whether the most recent tax assessment value is a reasonable estimate of the fair market value, the court may consider, among other factors, the recency of the tax assessment and the extent to which the jurisdiction's tax assessment practices reflect factors not relevant to fair market value.[1]

In <u>United States v. Washington</u>, 634 F.2d 1180, 1184 (10th Cir. 2011), the court observed: "where a lender has foreclosed and sold the collateral, the new loss should be determined by subtracting the sales price from the outstanding balance on the loan." With regard to defendant's unsupported arguments that, for example, the lenders allowed homes to deteriorate and lose value, the <u>Washington</u> court said: "... in a mortgage fraud case, the loss is not the decline in value of the collateral; the loss is the unpaid portion of the loan as offset by the value of the collateral." <u>Crowe</u> makes it clear that <u>Washington</u> remains the law in the Tenth Circuit.

Based on the relevant portion of Application Note 3 and relevant Tenth Circuit cases, the court directed the government to provide the amount of money owed to each lending institution as of the dates the co-defendant borrowers defaulted on their payments and the amounts the properties ultimately sold for. The government has done so. (Doc. 130

---

[1] The court has considered the Hudson report, attached to defendant's objections to the PSR. It may be that Hudson was attempting to reach value determinations based on the methodology of section 3.(E), although the report does not say so. In any event, section 3.(E) is not applicable because all the foreclosed homes have been sold.

and 130-1). Defendant has put forth the following supposedly "specific" objections to the figures (general objections such as hearsay, relevance, etc are omitted). When the court notes "no specific objection," that signals that the objection is overruled because it is without merit and/or does not result in a change in the loss calculation.

## Properties

2208 Glendale: no specific objection

2050 South Sante Fe: no specific objection

8431 South Hildreth: defendant claims that the balance due of $138,496.03 does not take into account payments totaling $1,877.87. Defendant provides no supporting documentation but the court will reduce the government's figure to $136,618.16.

1044 South Sedgwick: Defendant objects that the government's supporting document shows a purchase price of $20,660 from "HUD" whereas the lender was First Tennessee Bank. <u>Washington</u> makes clear that such an objection lacks merit. 634 F.2d at 1184-85. But the purchase price has been credited (Doc. 130-1, Ex. A) so the objection is overruled.

2431 Lulu: no specific objection

1510 N. Market: Defendant claims that government's exhibit 14 shows a purchase price of $13,000. That amount is reflected on Doc. 131-1, Exhibit A. Defendant's objection is overruled.

354 All Hallows: no specific objection

1901 Gary: Defendant claims that government exhibit 17 shows an unpaid balance of $36,000 on February 1, 2008. Actually exhibit 17 does not show any entry for February 1, 2008. What it does show is a

-9-

principal balance of $79,000 on January 23, 2008 and payments of $43,000 and $36,000 on February 11 and March 11, respectively, leaving a $0 principal balance. Exhibit 18 shows that the property was sold for $38,888 on March 16, 2008. These figures are noted on government Exhibit A. Defendant's objection is unclear but if it's that the unpaid balance was only $36,000, as opposed to $79,000, the objection is overruled.

2664 Classen: Defendant says that government Exhibit 19H shows an unpaid balance of $31,500 as of March 18, 2009. Actually it shows two principal balance figures as of that date: $50,041.42 and $31,500. Defendant's objection is overruled.

1118 Laura: The figure shown on government's exhibits 2 and 22 are accurately recorded on Attachment A. Defendant's objection is not clearly stated and is overruled.

735 Elizabeth: Defendant objects that government exhibit 23 has a "missing page" which "likely would have additional entries regarding the principal balance." Defendant's objection as to a missing page is overruled as speculation. However (and giving defendant the benefit of the doubt) the last principal balance entries on government's exhibit 23 are $43,200, as opposed to $56,650.55 shown on Attachment A. Defendant's objection is sustained and the default amount will be changed to $43,200.

5600 St. Francis: Defendant makes the same "missing page" objection, which is overruled as speculation.

Accordingly, applying the aforesaid adjustments to the figures set out in Attachment A, the court finds by a preponderance of evidence that the actual loss is $485,192.70. Defendant's total

-10-

offense level is 22 (PSR p. 29). Defendant's alternative figures (Exhibits K and L) are rejected because they do not reflect applicable law. Combined with his unobjected-to criminal history category II, defendant's guideline sentencing range is 46-57 months' imprisonment.

### Rule 32(h) notification

Pursuant to Fed. R. Crim. P. 32(h), the parties are notified that the court is considering an upward variance to as much as the maximum statutory prison sentence of 30 years. The court's reasons are as follows based on the factors set out in 18 U.S.C. §§ 3553 and 3661.

Defendant's offense of conviction is serious in and of itself, if for no other reason than it carries a 30-year maximum prison sentence. But defendant was charged in nine additional counts with violations of 18 U.S.C. §§ 1001, 1343, 1344 and 1957. These additional charges, all of which relate to defendant's overall fraud scheme, may be considered as relevant conduct and under §3661. Equally serious, if not actually more so, is that defendant recruited others to join his scheme and now each of those persons has a felony criminal record. Finally, and what makes the offense of conviction especially serious, is that it was committed while defendant was on probation from a conviction in this court of essentially the same conduct.

Defendant's history and characteristics are set out in the PSR. In addition, the court has received and read 48 letters written by defendant's family members and friends. One of the most objective and insightful is from his older brother, Mahmud al Alam. Fairly summarized, the letters describe an individual whose conduct and lifestyle are inconsistent with his conduct in this case and his previous case. Several letters express how remorseful defendant is

over his conduct and how much he has "learned" from it. The court accepts the letters as having been written in good faith and with genuine concern about how a prison sentence will affect defendant's family. What is missing from the letters, however, is an explanation why defendant engaged in his criminal activities and, in particular, why he re-offended. This, in turn, requires consideration of the statutory factors of respect for the law, adequate deterrence, protection of the public and just punishment.

Based on defendant's conduct, there is very little evidence that he respects the law. (Interestingly, defendant minored in criminal justice in college). That is not to say that he has hesitated to avail himself of its protections: he took Chapter 13 bankruptcy (PSR ¶175). Of course, the fact that defendant committed the crimes in this case while on probation is strong evidence of lack of deterrence, past and future. In this regard, it is relevant to all these factors that defendant's crimes are not spontaneous, such as a robbery, or influenced by dependence on controlled substances or because of a disadvantaged upbringing, lack of education or association with the "wrong people." Defendant's crimes required thorough planning, deliberate dishonesty and the recruitment of others. In other words, defendant's crimes are not merely incidental "mistakes" in an otherwise lawful life. Whether the sentence in this case will deter defendant from future criminal conduct when he is released from confinement is unknown but it will protect the public from defendant's crimes, at least while he is incarcerated.

There is no evidence that defendant requires educational or vocational training, medical or any other correctional treatment. The

only available sentence is incarceration. To the extent defendant's sentence is disparate from his co-defendant's sentences, it is hardly unwarranted given the nature of the case, defendant's involvement and the other factors just covered. Of course defendant will be required to make restitution but whether he will do so is, at this point, doubtful.

## Conclusion

The court will not make a final sentencing decision until the day of sentencing, August 11, 2014 at 1:30 p.m. Any procedural or substantive objections to this sentencing memorandum and Rule 32(h) notice must be filed no later than July 30, 2014. Any objections are limited to 5 double-spaced pages.

IT IS SO ORDERED.

Dated this 22nd day of July 2014, at Wichita, Kansas.

s/Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE