IN THE UNITED STATES DISTRICT COURT

DISTRICT OF KANSAS

UNITED STATES OF AMERICA          )
                                  )
                        Plaintiff,)
                                  ) District Court
vs.                               ) Case No. 13-10057
                                  ) Circuit Court
MANJUR ALAM                       ) Case No. 14-3169
                                  )
                        Defendant.)
                                  )
_____

**TRANSCRIPT OF SENTENCING**

On the 11th day of August, 2014, came on to be heard Sentencing in the above-entitled and numbered cause before the HONORABLE MONTI L. BELOT, Judge of the United States District Court for the District of Kansas, sitting in Wichita.

APPEARANCES:

The Plaintiff appeared by and through Mr. Aaron Smith and Ms. Michells Jacobs;

The Defendant appeared by and through Mr. Roger Falk and Mr. James McIntyre.

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas

(Beginning at 1:35 p.m. August 11, 2014, the following proceedings were held.)

THE COURT:  This is United States against Manjur Alam.  13-10057.  Aaron Smith and Michelle Jacobs appear for the Government.  And the Defendant appears with Roger Falk and James McIntyre.

Now, let's see what we're doing here today.  This is sentencing.  I have a presentence report; and I wrote counsel a letter, more than one letter, but basically -- well, actually --

(Off-the-record discussion between the Court and Law Clerk Ms. Silva.)

THE COURT:  Actually, there's been an awful lot of correspondence and filings in this case; but basically the issue that I was concerned about is initially expressed in my June 19 letter to counsel concerning the loss.  I think that was docketed but I don't have a docket number; but at any point, this was extensively responded to by counsel.  And after receiving the response, I prepared and circulated and filed a Sentencing Memorandum and Rule 32(h) notice, which is at Docket 132.  I ruled on all the objections that I was able to identify.  Notified counsel and the

Defendant that I intended to consider an upward variance from the guideline range.  The Defendant responded.  The Government did not.  And the Defendant's response is at Docket 134.  I have read that response and so I'm prepared today to impose sentence.  I'll hear from the Government.  I'll hear from Defendant.  I'll hear from defense counsel and anybody else that wants to address me concerning an appropriate sentence in this case.  Mr. Smith or Ms. Jacobs.  Whichever one of you wants to speak.

MR. SMITH:  Thank you Your Honor.  I'd like to highlight for the Court, as you're well aware that there was a Plea Agreement in this case.  It was entered into fairly expeditiously.  The way the Plea Agreement is worded, and it was our agreement, is that we were going to recommend the low end of a guideline sentence.  Defendant would be allowed to ask for a variance as long as he did not ask for less than twelve months.  That is simply a legal foundation from which we sit here.  That agreement is binding upon us even in the face of Your Honor's 32(h) notice and we do think that that's an appropriate sentence in this case.  I know Your Honor may have questions about why we've made that recommendation.

THE COURT:  No, it's your business, not mine.

MR. SMITH:  But the Government did have reasons for making that recommendation.  And ultimately what I think the Court does recognize is is the Defendant did make the decision to enter a guilty plea and not go to trial and he did so fairly early in the process.  Before we got to the point of making a plea agreement in this case, myself and Mr. Falk, Mr. McIntyre, worked collaboratively several times, had several meetings going through the case and the facts of the case and each individual person's role.  So this was not something where they presented themselves in an adversarial position from the get-go.  I think we always knew we were going to reach some sort of agreement.

The Defendant had a leadership role in this scheme, but the scheme was extremely complex and multipart and I think that a trial in this case could have been even mind-numbing for a jury to attempt to go through the complexities of the several different sales and schemes that would have lead up to each individual count that we would present to the jury.  And so that's something that we took into consideration as well.  And that was the guilty plea, the acceptance of responsibility that the Defendant made in this case, was not something that we could overlook or take lightly.  Despite his history, as Your Honor has pointed out, and the fact that he was on

probation for committing a similar scheme during a portion of this scheme.

THE COURT:  All right.  Mr. Falk.

MR. FALK:  Thank you, Your Honor.  May I address the Court from counsel table or do you want --

THE COURT:  You may.  Whichever is convenient for you.

MR. FALK:  Your Honor, this has been without a doubt perhaps the most complex case I've looked at in terms of sentencing.  I would be a fool to stand up here in front of this Court and not acknowledge that my client was on probation at the time of the commission of this offense, that he had committed a substantially similar type of offense in the past; but, I believe, as my response to the Court's memorandum points out, the fact that he received a two-level increase, which moved him from a criminal history category of 1 to a criminal history category of 2, thereby adding a minimum of five to a maximum of another six months to his sentence, that that is a factor which is taken into account under the guidelines.

THE COURT:  But -- I'm not going to interrupt you except to tell you, and I know you know this, I specifically am considering an upward variance, not an upward departure.

MR. FALK:  I understand, Your Honor.

THE COURT:  All right.

MR. FALK:  And I, I understand what the Court is proposing.  I would ask the Court to follow the plea agreement in this case while noting my objections previously made.  I just want to make it clear that we aren't giving up any of the arguments that were raised concerning sentencing.  I don't want an appellate court to look at this sentencing and say that because I didn't make a contemporaneous objection here at the time of sentencing, it's --

THE COURT:  Roger, how many times have you been in here over the years.  I don't ever cut defense counsel off from making a record; but your response was couched in terms of that I -- in terms of departures. And I give respectful consideration to the guidelines; but what I'm considering today is an upward variance from the guidelines, not upward departure.

MR. FALK:  In either event, Your Honor, we would ask the Court to give due consideration to the Plea Agreement which was reached in this case, to the guidelines as they exist.  Under the guidelines, as calculated with the loss figure being used by the Court, the Defendant would be looking at 46 to 57 months under the guidelines.  Now, that is a substantial period of

one's life.  I believe Manjur is at the present time --
I'm sorry, your age --

(Off-the-record.)

MR. FALK:  Is 47 years old.  He has a young son that he would be away from for almost four years. He's done eight months, almost nine months -- excuse me -- he's done nine months, almost ten months, in custody at this time.  We would ask that, as my original sentencing memorandum, that the Court temper its decisions with mercy in this particular case.  And I realize I'm in a poor position to ask for mercy when my client has committed a crime while on probation; but I believe that the sentencing guidelines adequately address that; and while the sentencing guidelines are purely advisory and not binding on this Court and This court is free to impose any sentence from zero to 30 years in this particular case, we would ask that the Court follow the Plea Agreement and that a sentence of no more than 46 months be imposed.

THE COURT:  Mr. Alam, I'll hear from you.

DEFENDANT:  I just want to repeat what I wrote in my letter to the Court that, first of all, I want to apologize to the Court and my family for my conduct. And I just ask that my life since 2008 be considered in the sentencing.  I know I can't ask for mercy; but I ask

for mercy for my family and my young son.  And any condition the Court finds just would be acceptable with me if I can just get back to work and help raise my children.

THE COURT:  All right.  Anything further?

MR. FALK:  I don't believe so.  I think Your Honor has been provided with letters from all of the family members who are present here today with the exception of maybe one.

THE COURT:  As I said, I got 48 letters.  I don't know whether they were all from the people who are here in court, but I've read them all and considered them all.  And what is absent from every single letter, was absent from the Defendant's statement, is why he did this.  Why --

MR. FALK:  Your Honor, I don't think there's a good answer to that question.  I don't know my client fully understands why he did this.  I'm sure it was financially motivated.  Can I defer to an attorney who's been with him for a number of years?

THE COURT:  Of course.

MR. FALK:  I'll let Mr. McIntyre address the Court.

MR. McINTYRE:  May it please the Court. Generally speaking, since I practice essentially no

criminal law and deal with real estate, I wouldn't have addressed the Court. But, I do think there is an explanation. And it isn't pure greed. What's missing -- these 14 houdrd you're dealing with are the tip of the iceberg. What Mr. Alam was doing, and these people that were back here in the courtroom were his business partners, the transactions, and his family. When he lost his real estate license in the first case, he had no way to earn a living. So what he did was -- and he was on probation so he couldn't have any interest in real estate.

THE COURT: Didn't he have a grocery store? And didn't he have a motel?

MR. McINTYRE: Those were in hock. Those were not producing income. He was robbing Peter to pay Paul. They were not -- they were -- I tried three times to keep him from going under; and I succeeded, but it's been a close run thing. So even though a lot of money has flowed through his hands, it hasn't actually ended up in his pocket. His house almost went to property tax sale and mortgage foreclosure last year, as did his motel. He's been in so many foreclosures with respect to his main income-producing properties, it's unbelievable. His grocery store, he had to pay about $3500 a month to another partner to buy his inventory.

So that grocery store was barely treading water.  He and his wife and son, who is here, were spending 12 to 14 hours a day in the grocery store and barely breaking even.  What he was actually doing was he had one -- not 14 houses, but owned 40 houses, since he had no credit --

THE COURT:  Wait a minute.  I'm having trouble understanding you.  You say he had 40 houses?

MR. McINTYRE:  Right.  Not every deal he did was dishonest.  We're missing the honest deals in the whole picture here.  If we went and got the whole real estates and we went through the whole transactions, we would see about 40 houses were sold to true buyers on true transactions.  He would partner up with someone in his ethnic community who had good credit and a good job.  They would go and get a real investor loan from a conventional lender like the Rose Hill State Bank.  They would put 20% down.  They would go in and make the improvments.  Those were honest loans.  Everybody knew everything.  But Manjur's name didn't appear of record.  And then he would sell the house, they would pay off the out-of-cash pocket, the expenses, and then they'd split the profits between the partner who's of record, the titled owner, and Manjur Alam.  And he had so many going and he had so many houses that he was investing in and

11

trying to improve and turn that he -- he was under an incredible cash flow analysis for the whole time.  And he had many houses that didn't go bad.  But he got caught in the market.  He had a bunch of houses that he overpaid for, put too much money in, and couldn't sell. So he came up with this scheme.  And he unloaded twelve houses, the worst houses.  It's like -- I can give you a specific example, 1500 South Main.  That's why I brought Hudson into this situation to show you what this is, what the honest value is worth.  He paid too much for it.  He put too much money in it and it was never going to be worth what he sold it for.  So he had too many transactions going at the same time.  And he -- basically, this was one way, as the market was starting to crash in 2006 and 2007, and believe me, this took a lot of other hands to help him out.  People who aren't even charged in this case.  Appraisers, title loan officers, mortgage brokers.  Mortgage broker got a commission on every one of these sales.

THE COURT:  Did all these people know or did any of them know that he was a convicted felon?  That he was convicted of essentially the same conduct and was on probation when all of this was going on?

MR. McINTYRE:  Not to my knowledge.

THE COURT:  Did you know it?

MR. McINTYRE: I didn't know this was going on. I knew he was a convicted felon; but I didn't know he was doing these transactions.

THE COURT: Neither did the probation office, who had a right to know. And he was ordered to tell them that he was doing these things.

MR. McINTYRE: I understand he broke the law.

THE COURT: When he went to the bank as a silent partner, Rose Hill Bank, you gave an example, did the Rose Hill Bank know that a silent partner in the transaction was a convicted felon?

MR. McINTYRE: They knew he was a silent partner. I don't think they knew he was a convicted felon. But since he wasn't of title and he wasn't signing mortgage, I don't think they cared. He had no interest of record, not even an affidavit of equitable interest.

THE COURT: All right. Go ahead.

MR. McINTYRE: So the why is he was juggling too many balls and they started to fall and he thought this was a quick and easy way out. He didn't really profit from this because in 2013 he almost lost his house. He was -- that's why he did the Chapter 13. That's why. It was a stop-gap measure to keep him from losing his hotel and his house. He owed 70,000 back

income taxes.  He owed an equal amount or more in back property taxes.

THE COURT:  I'm not interested, of course, in confidential communications that you and he may have had; but it sounds to me like you were rather intimately involved in all of this.

MR. McINTYRE:  Not in this.

THE COURT:  I don't mean in the criminal situation.  You were involved in advising him about how to save his businesses, his motel, his house, his grocery store.

MR. McINTYRE:  When he came to me when he was in deep trouble after he was already -- when the foreclosures were being filed, that's correct.

THE COURT:  And he didn't tell you -- and here again, I don't care what he told you or -- you can tell me or not -- but he didn't tell you that he was engaging in all these other real estate transactions then?

MR. McINTYRE:  You've got to put the time frame in order.  These happened in 2006 and 2007.  He came to me in 2012 and 2013.

THE COURT:  All right.  That answers my question.

MR. McINTYRE:  Yeah.  I didn't start -- he was in fair shape, I think, back then; but the market went

down and a lot of people got trapped, a lot of people.

THE COURT:  Well, yeah, they did.  Not all of them committed crimes, I don't think.

MR. McINTYRE:  I understand that, Your Honor, but there is a why.  And if you look at his family, you look at the finances that came out of it, it's not like he has half million dollars in a foreign bank account. And he does have a wife who is running that grocery store and is actually making it profitable for the first time in three -- since it's ever been opened.

THE COURT:  I understand.

MR. McINTYRE:  So I think -- I hope that answers your why.

THE COURT:  Well, it does.  It answers it; but it doesn't explain it.

MR. McINTYRE:  Doesn't excuse it.

THE COURT:  And it doesn't excuse it.  You're a good lawyer, Mr. McIntyre, you understand where we're at here.  And that's the problem that I have with this. All kind of people get into financial difficulties; but not everybody who gets into a financial difficulty commits a crime.  And, not everybody who gets in financial difficulties involves others who then get convicted of crime.  And I read Mr. Falk's response. I've known Mr. Falk a long, long time and I appreciate

his good work.  But this is not quite the same as being a leader and organizer.  Because, for one thing, as Mr. Smith said, this is -- this was complex.  It wasn't just the typical leader and organizer case that Mr. Falk and I have had over the years involving drug transactions.  This is a situation where a lot of thought and planning had to go into getting these other people involved.  It wasn't just something that somebody got involved in because they needed a little money here and there.  And I cannot overlook and will not overlook the fact that at the time all this was occurring, he was clearly in violation of his probation.  He was not communicating these financial transactions to the probation office as he was required to do.  If he had, then he would have been told to stop doing it.  He might have saved himself.  But he went ahead and he did all these things.  And I understand that financial problems can be a reason; but this is a man who, I'm reading the presentence report correctly, and I think I did, is intelligent.  He's educated.  He's smart.  If he had devoted himself to legal things, with the assistance of counsel, I think that would have been entirely appropriate and he would not only not be here, he would probably have a net worth more than the rest of us here.  Because he clearly is an intelligent guy who for

whatever reason got this thing started.

Now, I don't know.  Government has to decide these matters, whether or not to take a case to trial or whether to negotiate a plea.  That is none of my business.  I've had a lot of cases in this court, though, that were complex that went to trial.  And that's the Government's business, not mine.  And I appreciate that he plead guilty.  But -- and saved me time and saved the Government time and money.  But I'm still concerned about somebody who, in Mr. Alam's situation, essentially thumbs his nose at this court.  Not me, because it was Marten who sentenced him initially.  But thumbs his nose at the court and goes right back to doing what he just got put on probation for.  I don't know why he got probation in the prior case.  I don't have any reason to think there was anything wrong about it; but I can't help but wonder if he'd have gotten a little bit of jail time out of that first case, maybe he wouldn't be here today.  Who knows.  That's the kind of consideration, though, Mr. Falk, that you talk about when you talk about deterrence.  And I don't think, over the 23 years that I've been here, that I've had too many cases that I can remember where someone got put on probation upstairs and immediately started committing the crime over again.  It's new to me

anyway.

I incorporate what I said in the Sentencing Memorandum and the Rule 32(h) notice. I don't see any reason to restate those things. They're there. They're there for whatever they are. And I just do not believe that a guideline sentence in this case is sufficient to satisfy the requirements for a fair sentence and I don't intend to impose one. And, of course, the Defendant can appeal if he wishes. I'm sure he will. The time that he spent in jail pending sentence will count towards sentencing, towards the term of confinement, in any event. And if there's nothing further, I'm prepared to announce sentence.

MR. FALK: Nothing further from the defense, Your Honor.

THE COURT: I think I've already indicated that I have accepted the guilty plea. To the extent that I did not go along with the Plea Agreement, I'm not required to go along with the Plea Agreement, obviously, and told the Defendant that when I took his plea.

I find that the presentence report as reflected by my rulings on the objections and my Rule 32(h) notice are correct and order the -- them to be incorporated into the following sentence. Pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that

the Defendant, Manjur Alam, is sentenced to the custody of the Bureau of Prisons for a term of 72 months on Count 1.  To be followed by five years of supervised release.

Within 72 hours of release, he's to report to the probation office in the district to which he is released.  While on supervised release, he shall not commit another federal, state or local crime; shall comply with the standard conditions of supervision adopted by this Court; the mandatory condition that he refrain from any unlawful use of a controlled substance, submit to drug tests whenever directed by the probation office.  He's to cooperate in the collection of DNA.

Now, special conditions.  He is not to incur any new credit charges or open or attempt to open any additional lines of credit without the prior approval of the probation office.  He shall execute any release forms necessary for the probation officer to monitor his compliance with credit restrictions.  He is to immediately provide the probation office with access to any and all requested financial information, including executing any release of information forms required.  He shall file truthful and complete federal and state income tax returns in a timely manner.  He shall submit his person, house, residence, vehicles, papers, place of

employment and any property under his control to a search.  He is prohibited from possessing or purchasing a firearm, ammunition, destructive device or other dangerous weapon.  He will pay the special assessment, which is due immediately but may be satisfied while in custody.

Paragraph 196 of the presentence report speaks to restitution.  Is it necessary for me to read that out in detail, Mr. Falk?

MR. FALK:  It's not necessary at this time, Your Honor.

THE COURT:  He is to make that restitution. No interest will be imposed on the restitution. However --

MR. FALK:  Your Honor, the only question I had in that regard, most -- the presentence investigation report discusses it in terms of the banks having lost the money.  It wasn't actually the banks.  In every one of these cases, there was either HUD, Fannie Mae, one of the -- there was mortgage insurance and the banks went to the federal agencies and had them -- I'm sure it's something that we can resolve as to who the money ought to end up with; but I think in some cases where it mentioned a bank, it was actually -- the actual loss was suffered by a federal agency.

MR. SMITH:  Your Honor, if you just make the finding and order the amount, then we'll provide to probation the payee.

THE COURT:  The total amount is $258,309.21. 258,309.21.  That's the amount of restitution owed.  And if the parties can work with Roy Day, the probation officer, we can amend the presentence report or I'll do a separate order or whatever is necessary to identify the people to whom restitution has to be made.  But that's the amount.

All right.  He's to forfeit the property listed in the forfeiture allegation of the Superseding Indictment.

Voluntary surrender is denied.

You may, if you wish, appeal.  Mr. Falk's already indicated that you're going to and that's fine.  He'll take care of that for you.  Do you have any questions?

(Off-the-record discussion between Mr. Falk and Defendant Mr. Alam.)

MR. FALK:  Your Honor, the question that was asked is which house was listed in the forfeiture.

MR. SMITH:  I don't think we named any specific property, Your Honor.  I believe we named it as a money judgment and substitute property.  I'm double checking.  The forfeiture allegation was for a money

judgment and substitute assets.  We didn't name any specific property.

MR. FALK:  Just wanted to make sure that the family home wasn't what was being forfeited.

THE COURT:  Well, if there's some question about that, I suppose maybe we ought to clear that up now.  Is his family home part of the forfeiture?

MR. SMITH:  No.

THE COURT:  All right.  That takes care of that.

MR. FALK:  Thank you, Your Honor.

THE COURT:  Anything further?

MR. FALK:  Nothing on behalf of the Defendant, Your Honor.

MR. SMITH:  Your Honor --

THE COURT:  Dismiss the other counts?

MR. SMITH:  I would move to dismiss the remaining counts of this Indictment and Superseding Indictment.

THE COURT:  All right.  He's excused.

(Adjourned at 2:10 p.m.)

C E R T I F I C A T E

I, Cindy L. Schwemmer, United States Court Reporter in and for the District of Kansas, do hereby certify:

That the above and foregoing proceedings were taken by me at said time and place in stenotype;

That thereafter said proceedings were transcribed under my direction and supervision by means of computer-aided transcription, and that the above and foregoing constitutes a full, true and correct transcript of said proceedings;

That I am a disinterested person to the said action.

IN WITNESS WHEREOF, I hereto set my electronic signature on this the 20th day of October, 2014.

s/ Cindy L. Schwemmer

Cindy L. Schwemmer, RPR, FCRR

United States Court Reporter

Cindy L. Schwemmer, Certified Shorthand Reporter
United States District Court, Wichita, Kansas